[Civ. No. 678.    Third Appellate District.—June 28, 1911.]

F. C. LOOMIS, Respondent, v. CONNECTICUT FIRE INSURANCE COMPANY, Appellant.

FIRE INSURANCE—ACTION ON POLICY—DEFENSE—PROVISO AS TO "FALL OF BUILDING OR PART" FROM OTHER CAUSE—CESSATION OF POLICY —VERDICT AGAINST EVIDENCE.—Where a policy of fire insurance contained a clause providing: "If the building or any part thereof fall, except as the result of fire, all insurance by this policy on such building or its contents shall immediately cease," and in an action thereon the defense was that a substantial part of the

building containing the insured contents fell as the result of the earthquake preceding the fire of April 18, 1906, in Santa Rosa, it is held that the evidence, without conflict, sustained such defense, and that the special and general verdict of the jury to the contrary was against the evidence, and cannot be sustained.

ID.—PROPER INSTRUCTION—TIME OF FALL OF MATERIAL PART OF BUILDING.—The court properely instructed the jury that, "In order for the insurer to be exonerated from liability under the 'fallen building' clause of the policy, both of two events must have happened: First, a material or substantial part of the building in which the insured goods were contained must have fallen from a cause other than fire, i. e., earthquake; and second, that such falling must have occurred before either the building or the insured goods contained therein had been attacked by fire."

ID.—FAILURE TO FIND TIME OF FALLING OF FRONT WALL—POWER OF APPELLATE COURT—OTHER FINDINGS—PROOF—REVERSAL REQUIRED. Where the jury failed to find the time of the falling of the front wall of the building, the appellate court cannot supply such finding; but where the jury found that no part of the building fell by reason of the earthquake shock, either before or after the fire, and the evidence clearly shows, without conflict, that the iron lintels and the whole upper front story of the building fell to the ground, through the awning, as the result of the earthquake before the fire occurred in the building, such proof requires a reversal.

ID.—INADMISSIBLE EVIDENCE—EFFECT OF EARTHQUAKE ON OTHER BUILDINGS.—The court properly excluded evidence to show the effect of the earthquake on other buildings.

APPEAL from a judgment of the Superior Court of Sonoma County, and from an order denying a new trial. Emmett Seawell, Judge.

The facts are stated in the opinion of the court.

A. B. Ware, and T. C. Van Ness, for Appellant.

Thomas J. Geary, for Respondent.

CHIPMAN, P. J.—The action is to recover upon a policy of fire insurance issued by defendant and covering certain goods of plaintiff while contained in the two-story brick building number 521 Fourth street, north side, between B and Mendocino streets, Santa Rosa. The loss occurred April 18, 1906, by fire. Defendant based its defense upon the following clause in the policy: "If the building or any part

thereof fall, except as the result of fire, all insurance by this policy on such building or its contents shall immediately cease.''

The cause was tried by a jury and plaintiff had the verdict on which judgment was duly entered. The appeal is from the judgment on the verdict and the order denying defendant's motion for a new trial.

In addition to the general verdict the jury answered certain particular questions as follows:

''1. Did the building . . . fall as a whole from a cause other than fire before plaintiff's stock of goods was attacked by fire? No.

''2. Did said building fall as a whole from any cause after plaintiff's stock of goods was attacked by fire? No.

''3. Did a part or parts, not constituting a material or substantial part of the building . . . fall from a cause other than fire before said stock of goods was attacked by fire? No.

''4. Was not answered because the answer to No. 3 was No.

''5. Did a part or parts of the building . . . fall from a cause other than fire after plaintiff's stock of goods was attacked? No.

''6. Was not answered because of the last negative answer.

''7. Did a material or substantial part or parts of said building . . . fall from a cause other than fire before plaintiff's stock of goods was attacked by fire? No.

''8. Was not answered because of this negative answer.

''9. Did the building . . . or a material part thereof fall from a cause other than fire prior to the occurrence of fire in said building? No.

''10. Did the building . . . or a material part thereof, fall from a cause other than fire after the occurrence of fire therein? No.''

While urging certain errors committed by the trial court, appellant states that the principal grounds relied upon for a reversal are: First, that the court erred in permitting plaintiff to introduce evidence of a waiver by defendant of the plaintiff's compliance with the provision of the policy relating to the furnishing of notice of loss, and, second, that the jury, in finding upon the issues presented to it under the ''fallen building'' clause, ''wholly disregarded the undis-

puted evidence before it'' and ''based its conclusion solely upon its prejudice against the defendant.''

We find it unnecessary to consider the first objection.

After a careful examination and analysis of the testimony, we are satisfied that it appears, without substantial conflict in the testimony, that a material and substantial part of the front wall fell before the fire attacked the building or the goods of plaintiff.

There was evidence sufficient to show that the rear wall and the side walls of the building, except toward the front, were not materially damaged, although there is evidence to the contrary. As to the second story front wall there is much evidence that it went out as far down as the floor of the second story and that the front part of the roof was down to this floor, slanting back to where it was not disturbed. The testimony relates to what certain witnesses observed at the rear of the building on Fifth street, and what certain others observed at its front on Fourth street. Only one witness, Frank Muther, the chief of the fire department, seemed to have been in a position to observe the entire building, and he was the one most likely to have made his observations with a cool head and some deliberation. Both parties quote quite freely from his testimony. He was called by the defendant. He resided two blocks from Fourth street. He had a store at No. 513 and plaintiff's store was No. 521, east in the same block. He testified: ''When the shock first began I was in my bed, that was two blocks from Fourth street. As soon as I could stand on my feet and gather myself together, I slipped on part of my clothes and took the rest in my hands and I skinned down the street toward Fourth street. . . . When I went up toward my store I went somewheres around the center of the street. I know where the Loomis store was. I was at 513 and his number was 521. That was the same block, I believe, same side of the street. I saw my store and all the other stores that morning. I went up on top of them. Q. What store did you go on top of? A. Well, it was about fifty feet between my store and Loomis'; I won't be positive exactly which store these conditions were. It was either the electric light works or the store next door. I got up on the roof by climbing over the debris. The debris came from the top of the buildings. I saw the front and back of

the Loomis store that morning, and I was on top of it. The roof was in pretty good condition in the rear but it was not in the front. In front the upper story had fallen down through the awning, as far as the windows were concerned, but the lower story, I think was in pretty good tact. The side walls also stood in the middle of the building. The front part of the roof slanted toward the front. The top of the roof had not sagged down or settled uniformly, because some of the windows had fallen down farther out than the other and the roof lay promiscuously, and it was uneven. With reference to the floor in the second story, the roof was in some places down pretty low and in some places seemed to be pretty near intact. Of course, the walls was broken more or less. I couldn't say as to the floor of the second story, whether it was broken, because I was on top of it. I couldn't see down through where there was any holes broken through, anything of that kind. I don't think there was. I couldn't swear positively. The building in front was faced with cast-iron and the lintels that crossed were out. Them buildings were only just faced; this cast-iron stuff was only there for a veneer. It didn't hold nothing, and they were all shook away on every building in the block. The lintels were the cast-irons that went over the doors of the lower story in front. They had gone out into the street or on to the sidewalk, but the brick did not. The lintels all left the buildings on every building in the block, because they were all cast-iron veneer. They are not built into the building; only stuck up there. On the Fourth street side the awning, the top, the fire wall was pretty well broken down, and went through the building and some places it had broken the windows and some of the parts between the windows were down; some stood up uneven, of course. The rear wall was not down, and the roof was resting in the center. The front part of that building was the worst, the Fourth street side. The roof might have been resting on the second floor right in front where the front broke out. I went into that building from Fourth street by climbing over the debris. I had no ladder there. There were awnings; the brick came down and went through these awnings and I partly used the awnings and partly piled over the stuff that leaned against the building, and climbed up that way. I went up there a purpose to take in the situation

of the fire, and what to do to fight the fire, and at that time
there were fires next adjacent to this building, also in the
drug-store, and in the electric light office next door.   Q.   At
that time, was there any fire in the Loomis building?   A.
There was in the store next door and in the one next to that.
Q.   I ask you the question: At that time when you were up
there, was there any fire in the Loomis building, that is any-
where on the top of the roof?   A.   Well, I am stating where
I am standing, Mr. Ware.   I am not stating whether it was
one store or two.   I think it was two stores in that building,
wasn't there?   Q.   No, only one.   A.   Only one?   Well,
then, there was not.   But the next store to that toward mine
was afire, and that next one to that was afire; that is the
electric light office and the drug-store.   From the informa-
tion I got from my men at the engine-house, when they were
drove out of the engine-house, there was fire there as soon
as they came out in the electric lighting company.   I re-
mained on the top of that building long enough to make up
my mind that the block was doomed and I would get down
and fight the frame district and let the brick district go.   It
couldn't burn up soon enough to suit me.   I knew it had to
burn, and when it was gutted it would stop jeopardy to other
property, my own included.   Of course I said that the rear
wall was not down; I mean by that in a general way.   I do
not know that there was not a brick off from it; there might
have been, because there was not time that morning to look
very close.   There was plenty of work to do, but in a general
way the rear wall was up.   The upper story of the front wall
was broken out; the lower story was all right, I think.   These
iron pillars were nothing but facing.   I am not positive that
there were any iron posts or pillars that supported the lintels
for the doors, because those fronts have been changed around
so often.   I don't know how old a building the Loomis build-
ing was, but it had been there a good many years.   The
Loomis building was like all of them buildings was, mostly
thirteen inch brick walls, and then patched over a dozen times
in front, and change the stores around a half dozen times
since I have been in this town.   The lintels lay on the side-
walk.   I think that after the earthquake anybody could have
entered that store by the lower door, if they had been willing
to take chances.   I wasn't willing to do it; I peeped into

those places front and back. I could have crawled in. I looked into all of them stores to see if it was broke down inside or not, in front and back. I didn't see a fire in that store. There was next door.

## "Cross-examination.

"To Mr. Geary: Q. These lintels in there was a stiff sheet of cast-iron that was placed on the building for ornamental purposes; did not support any weight at all. The second story front of that building was made up of two large bay windows, occupying almost the entire front of it, more window than brick, and then a line of brick between the bay windows and at the edge of the bay window, and the roof rested on that, so when those windows broke out, it let the front of the roof sag down, and they had very heavy fire walls up there, very high ones, to make a showing and of course those high walls soon went. I don't know how high the fire wall was in the Loomis building; it was on the same line to me and mine was seven feet. A fire wall is a wall that projects over the main building, above the roof which is called a fire wall, because in case of fire next door the blaze could not catch the roof. The blaze could go on up. It necessarily projects over the roof line, carrying no weight on it whatsoever, only its own weight, no bracing, no timbers or anything. Loomis occupied one store in the Clute building and Brooks the other store. Next to my place was a millinery shop; next to that was the Davis drug-store, then came the electric light company and then Loomis and then Brooks. Loomis was immediately adjoining the electric light building. When I climbed up I couldn't tell within ten feet one way or what. My object in going up on top of the building was to observe the condition of the town. There was a fire back, and there was a fire in the electric lighting company; there was a fire in the Davis drug-store, one in the Doyle block in Newman's and it looked like there was another one right in back of King's somewhere, or back of the Grapevine saloon. There was one fire back of Loomis' or one back of the electric company, or the Newman drug-store. There was one in the electric light company and there was one back of the next door, the drug-store, and there was one in Mrs. Carither's on the other side. I could see the rear part of these build-

ings where Mr. Loomis' store was, the stairs alongside the wall of them in the back yard was already afire. Just as fast as I could run two blocks and get there, I was on top of that building. I hardly think it was within five minutes after the shock, it was almost ten minutes. Q. At that time all the rear of the Loomis building and the electric light building was then on fire? Mr. Ware: To that we object, the witness has not so stated and it assumes a fact in reference to the Loomis building that is not in his testimony. Mr. Geary: Go back and read the answer. The Witness: Well, I said there was a fire back there from the Loomis building, but not in the Loomis store; in back of his store and back of the next store. That is it. Mr. Geary: You say it was in the same building? A. Back of it. The fire-engine house was situated in the rear of the Davis store and the others on Fifth street. I went on top of the Loomis store and took that observation of the fire adjoining the Loomis store before I went to the engine-house and when I came down there by that time the boys were getting the rigs out. . . . Q. How soon after you got there did you see the wooden buildings in the rear of the brick buildings on the north side of Fourth street on fire? A. When I got there they were afire. The alley-way back of the Loomis store, Brooks store and back of the electric light company all along there were piled all kinds of boxes as high as they could pile them up, all along there and wooden sheds. When I looked over there from the top of the Davis building they were afire and the wooden buildings in the rear were on fire and traveling right toward the engine-house. . . . The firemen had already commenced playing water upon the rear of the Loomis store when I got there, and I ordered it stopped. The Davis drug-store was immediately adjoining the Loomis store. . . .

### "Redirect Examination.

"To Mr. Ware: Immediately back of the Loomis building about twenty feet there, I think was vacant. There were all kinds of sheds in the rear of the Loomis building. The sheds did not face on Fifth, they were back against the building, and them sheds connected with other sheds that did go up against these other buildings. Some of the sheds, the wood-sheds that were on fire in the rear, were immediately adjacent

to or in rear of the Loomis building. . . . The sheds which connected the Loomis store on the west side clean to the firehouse was all connected to one another and fences and everything else.   There were different owners and different sheds all built together.   When I went up on the roof of the Loomis building there was no fire in the Loomis building or the Brooks store.''

Witness Hearn, for defendant, testified: ''I was up and around and dressed at the time of the earthquake.   I was tending bar in Mr. Bloom's.   (Nearly opposite the plaintiff's store.)   I jumped over the bar and ran out in the middle of Fourth street right in the middle of the track.   The earthquake had not ceased when I got to the middle of the track. As the result of the earthquake shock, so far as I could judge, the block including Mr. Loomis' store was pretty well down from the first story up.   I could not tell much about the bottom story.   Of course, I did not look close enough for it, but I could see that the upper story was pretty well down. . . . At that time there was no fire in that building.''   On cross-examination he testified: That he did not notice the Loomis building particularly any more than any other building; that he stood there some minutes; saw fire in the block after the earthquake at Pohley's saloon, sixty or eighty feet away from where he was standing; also on the corner of B and Fourth streets.   Witness Barnes, for defendant, testified that he passed along Fourth street in front of the Loomis building eight or ten minutes after the earthquake; that the buildings were all down as far as he saw; did not see any fire in the Loomis building.   On cross-examination he testified: ''I cannot separately state to the jury what was the condition of the Loomis building.''   On redirect he testified: ''I cannot describe the Loomis building separately.   There was none in the block standing but I could not say it separately.''

Witness Ward testified that he lived about a block and a half from Fourth street on Mendocino: ''I observed the buildings on the north side of Fourth street between Mendocino and B, somewhere from ten to twenty minutes after the earthquake. . . . At that time I couldn't tell for the life of me which was the Loomis building.   Q.   Why?   A.   Well, because of the dilapidated condition.   Q.   What?   A.   They were down, had fallen down mostly all along there and I

could not tell one building from another. In front of that building and the other buildings in that block there was debris all along there from Mendocino down on that day. I walked down the Fourth street about the center of the street. I don't think anyone could have walked on the sidewalk.

"Cross-examination.

"To Mr. Geary: I went from my house to the crossing of Fourth and Mendocino and then over to Hinton avenue and looked in the jail, then turned and went down Fourth street. I think I was considerably excited. I remember some things I saw, of course. I did not stop to look for any particular building as I went down Fourth street. I walked down Fourth street. Q. Now, then, was the roof still on the Loomis building when you passed it? A. As I said before, I could not recognize the Loomis building. Q. I am asking you now where was the roof of the Loomis building when you went by. If you saw anything, what did you see? A. Well, mashed in more or less like all the rest. I could not designate the Loomis building; it is like all the rest of them, down. I have not a distinct recollection of how the Loomis building was at that time, not particularly the Loomis building."

Witness Wilson testified that he came down to his place of business immediately after the earthquake. He testified: "I went straight down Fourth street, past the St. Rose. That was at the corner of Fourth and A. I know where the Loomis store was. I passed that. I saw the block on the north side. The buildings on the north side of Fourth street, between Mendocino and B, that morning. Nearly half an hour from the time I left home. I could not tell the condition of the Loomis building or of any particular buildings; they were all down it seemed to me. Taking all of the buildings from Mendocino street clear through to B, two-story brick, on the north side, they appeared to be all down to me."

Witness Owen testified: "I know where the Loomis store was. I passed by there that morning. It could not have been more than three-quarters of an hour after the earthquake when I passed that store. The brick buildings on the north side of Fourth street, between B and Mendocino, including, of course, the store occupied by Mr. Loomis, looked

to me as though they were all down.  The street in front of those buildings and on the north side was pretty well filled up with debris.  I mean by debris the walls of the fronts of the buildings falling toward the street.  These fallen walls covered much of the street.

"Cross-examination.

"To Mr. Geary: . . . I passed by in front of the Loomis store and stopped and observed the buildings as I went along. I did not observe the rear wall; I was not on Fifth street; I could not see the rear wall because the roof was sloping this way, the wall was sloping."

Witness Broback testified: "I was living in the city of Santa Rosa on the 18th of April, 1906, at 415 A street.  I was at my residence at the time of the earthquake.  I know where the place of business or store of Mr. Loomis was.  I passed by his store that morning, probably from a half to three-quarters of an hour after the earthquake.  I observed the buildings in the block between Mendocino and B street on the north side of Fourth street as I passed by, including the Loomis building, and I believe it was down.  The buildings looked to me like they were all shaken down—some one way, some in another, some in the street; in fact, you could hardly get up the street.  I could not get up the street on account of what was shaken in the street, or what was in there.  Bricks and wood.  Some of them were directly in the street, some of them were clear out in the car-track in the center of the street.  Q. Now, from B street to Mendocino street, on the north side of Fourth street, was there any brick two-story building standing?  A. No, sir; I didn't see any.

"Cross-examination.

"To Mr. Geary: Q.  Did you notice the building which was occupied by Mr. Loomis as you went by there that morning?  A.  No, sir; I don't believe I could have found the building.  I didn't make any effort to find it.  I cannot give to this jury any separate impression of the condition of the Loomis building that morning.  I had no interest in observing the condition of any building.  I don't believe I could exactly describe the building next to the Loomis build-

ing, its condition as I passed by it. I did not stop to look at any particular building as I went by, in any particular.

"Redirect Examination.

"To Mr. Ware: Those buildings most all looked about alike to me. Q. Why was it that you could not answer Mr. Geary's question as to want of ability on your part to identify any particular store or number of building between Mendocino and B on the north side of the street? A. I don't think I could have found any one building without making a particular—looking particularly for it. Q. Why? A. In the condition they were in. Q. Well, describe that condition to this court and jury, please. A. I don't know as I can do that exactly; they were all shaken down in such a shape that I did not look for any particular building. Q. Why it is that you could not identify any one store that you passed by? A. Well, in the first place, I did not pay particular attention to any one store, and then they were in such shape that I don't believe I could have found a store unless I had some interest in it in looking at it. The Court: Why was it? What do you mean by 'they were in such a shape,' what do you mean by that? A. Well, they were shaken down in such a condition that if I did not have any particular interest in the building, I didn't notice it any more than I did all the rest—just merely walking along, looking at them all.

"Recross-examination.

"To Mr. Geary: I don't believe I saw the roof of the Loomis building that morning as I went by. I do not know whether the roof of the rear wall was down. I don't believe I know whether the sidewalls were down."

Witness Simpson testified: "I reside in Santa Rosa and have resided in Santa Rosa for a little more than thirty years. My business is that of a contractor and builder. I know the building where Mr. F. C. Loomis did business up to the time of the earthquake. My firm put in new fronts, store fronts, lintels, in that building. The lintels that were put in by my firm were constructed of steel. They were anchored to the store joists and also to the other lintels at the ends. These lintels were supported at the end by the pilasters of the walls and the center by cast-iron columns.

These lintels were twelve-inch thirty-five pound steel T-irons, two of them, put about eleven inches apart, and supported with bolts through them, and at the ends there were holes for the anchorage, from the one to the other. They were all anchored together, with straps of iron and boltings. Usually we have two columns of what is called three-quarter cast columns that go in the corner of the show-windows, made out of cast-iron. At the bottom there is iron sills for those columns to rest on, and then the wood work came in between that. Then on top of course the brick was built from there up. On the face of the lintels was a wooden facing, which came down up to the ceiling on the inside, usually about one foot below the ceiling inside was the bottom of the lintel, and these lintels were anchored above to the joists. Usually a twenty-foot would be anchored in the center, a big one in the center like that, and would go back four or five feet into the building. That is the way they was constructed at that time. The lintels supported the brick work of the building immediately above the lintels. . . . The Loomis building was built when I came here, and I have been here thirty years. The front of that building had been changed four or five different times, probably.

### "Cross-examination.

"To Mr. Geary: The columns in front on the first story of the Loomis building which held up the lintels were iron. There was wood inside these columns. The weight of the second story front of that building would be something like four tons. The iron columns, each of them would carry about twenty-seven or twenty-eight tons. There were two iron columns there; if there had been no columns there at all the lintels would carry the weight.

### "Redirect Examination.

"Mr. Ware: Q. With reference to the vibration, if the vibration comes and these columns slant and the lintels go out of the building, what would they support? A. They wouldn't support anything, I suppose. Q. The lintels are placed above the columns, aren't they? A. Yes, sir. Q. When the lintels go out the columns would go with them? A. I suppose they must go. I don't see how—they could

not stand there alone unless the frame work held them. Q. Assuming, now, that the lintels of the Loomis building went out from the effect of the earthquake—assuming that; and they were out in the street, what would there be to support the brick and mortar above the windows? A. There is no question, if the lintels could go out, of course, the brick work would go down—there is no question about that. How it could do it I couldn't say. I don't know anything about that."

Witness Mathews testified: "I resided in this city on April 18, 1906. I was rooming at the Ramona rooming-house, on the south side of Fourth street, between B and Exchange Avenue. Q. How nearly opposite to Loomis' store, where Mr. Loomis then had his store? A. Just a little west, about one store west, I should say. I remember the occurrence of the earthquake. I was at the Ramona rooming-house at that time. I stayed in bed until the thing was over and then I got up and got out, walked out on the bricks. Those bricks came from the building I was in. I saw some of the buildings on the north side of Fourth street, between B and Mendocino. It looked to me as though they were all down, and I was just across the street from the Loomis building. I paid no particular attention to any one building there, but the street was pretty well filled up with debris on both sides, from the side I was on and the other side."

The plaintiff introduced no testimony as to the condition of the front wall of the building following the earthquake. The testimony upon this point is without conflict. Plaintiff's rebuttal is addressed exclusively to the condition of the rear wall and the side walls and to the time the fire was first discovered in or about the building. As already observed, the evidence justified the finding of the jury so far as concerned the rear wall and the greater part, if not all, of the side walls. But we think it insufficient to justify the findings when applied to the front wall, for we can reach no other conclusion from the uncontradicted testimony than that a material and substantial part of the front wall had fallen. The only question admitting of controversy is, Did this front wall fall before the fire attacked the building or plaintiff's goods within the building? Defendant states the theory of the instructions given the jury as follows: "That, in order

16 Cal. App.—35

for the insurer to be exonerated from liability under the 'fallen building' clause of the policy, both of two events must have happened: First, a material or substantial part of the building, in which the insured goods were contained, must have fallen from a cause other than fire, i. e., earthquake; and, second, that such falling must have occurred *before* either the building or the insured goods, contained therein, had been attacked by fire.'' Defendant disputes the correctness of the second proposition.

The jury found that no part of the building fell by reason of the earthquake shock, either before or after the fire had attacked the goods of plaintiff therein, but it seems not to have considered whether the falling occurred before or after the fire, and it could not have found on this fact by its general verdict, for it found explicitly that there was no falling at all from any cause. In this state of the case defendant contends that if the finding of the jury that a material or substantial part of the building did not fall by reason of the earthquake shock is unsupported by the evidence, the judgment must be reversed, for the jury made no finding as to the time of the falling, and the appellate court cannot supply a finding upon that question; citing *Smith* v. *Immigration etc. Assn.*, 78 Cal. 289, [12 Am. St. Rep. 53, 20 Pac. 677], and other cases. In the case noted the court held that although the evidence was sufficient to have supported the omitted finding, the court had no authority to supply it. There is force in the point made, but we think the theory of the instruction given is supported by reason and authority. (*Western Assur. Co. of Toronto* v. *J. H. Mohlman Co.*, 83 Fed. 811, [28 C. C. A. 157]; *London L. F. & I. Co.* v. *Cronk*, 91 Tenn. 376, [23 S. W. 140].)

"If the building, or any material part of it, should fall before any fire broke out and caused damage to the property insured, the insurer would not be liable." (*Nelson* v. *Traders' Ins. Co.*, 181 N. Y. 472, [74 N. E. 421].)

That a material and substantial part of the front wall of the building went out before the fire attacked the building or plaintiff's goods satisfactorily appears. The evidence is that the earthquake occurred at 5:13 A. M. and lasted about forty-five seconds. Fire Chief Muther was on top of the building eight or ten minutes after the earthquake shock, and there

was no fire in the building then, although the fire had attacked adjoining buildings and the sheds and boxes and other inflammable material at the rear of plaintiff's store were on fire. Several witnesses saw the fire in these outbuildings or shacks at times varying from five to ten minutes after the earthquake. Plaintiff himself arrived at the rear of his store building five or ten minutes after he was aroused by the shock and these sheds were on fire. He testified that the fire had burned through the rear door of the building and he could see that the fire was attacking his goods. He did not go to the Fourth street front and did not know its then condition. The evidence was that this fire in the rear of the block was first discovered back of the Davis and the electric light company building and spread to other of these sheds. There was no evidence such as appeared in the case of *Davis v. Connecticut Fire Ins. Co.,* 158 Cal. 766, [112 Pac. 549], showing that the fire occurred through the breaking of electric wires by the earthquake and appeared simultaneously with the shock. In the present case the fire is traceable to the earthquake indirectly, but it is reasonably certain that the fire had nothing to do with the falling of the walls, and it is also reasonably certain, as appears from the evidence, that the walls had fallen before the discovery of any fire in the building or among the sheds and debris immediately in its rear.

Appellant makes no complaint of the instructions given, and it seems to us that they correctly state the law and substantially meet the object of defendant's requested instructions, pointed out in its brief, which the court refused.

One other point made in appellant's brief should be noticed. It sought to prove the effect of the earthquake on other buildings—the courthouse among them. We think the court rightly denied the offer. We passed upon the point in *Fountain* v. *Connecticut Fire Ins. Co.,* (Cal. App.), 117 Pac. 630.\* (See Wigmore on Evidence, sec. 442.)

The judgment and order are reversed.

Hart, J., and Burnett, J., concurred.

---

\*After the judgment of the district court of appeal, the case of *Fountain* v. *Connecticut Fire Ins. Co.* was transferred to the supreme court, and the opinion of the supreme court therein is reported in 158 Cal. 760.